**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KRISTYN WILDER,**

                **Plaintiff,**                **CASE NO. 2:04-CV-1199**

        **vs.**                **MAGISTRATE JUDGE KING**

**GUILFORD PHARMACEUTICAL**
**PRODUCTS, INC.,**

        **Defendant.**

**<u>OPINION AND ORDER</u>**

In this employment discrimination action, Kristyn Wilder ("plaintiff"), formerly

employed by Guilford Pharmaceutical Products, Inc., ("defendant"), asserts claims under Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§2000e-5, and Chapter 4112 of the

Ohio Revised Code ("O.R.C."), §§ 4112.02, 4112.99. Plaintiff alleges that defendant terminated

her employment because of her pregnancy and because of her complaints of pregnancy

discrimination.

This matter is before the Court on *Defendant's Motion to Compel and for Sanctions*, Doc.

No. 48, and, with the consent of the parties, 28 U.S.C. § 636(c), *Defendant's Motion to Dismiss*,

Doc. No. 40, and *Defendant's Motion for Summary Judgment*, Doc. No. 55. For the reasons set

forth below, *Defendant's Motion for Summary Judgment* is **GRANTED**, *Defendant's Motion to*

*Dismiss* and *Defendant's Motion to Compel and for Sanctions* are **DENIED**. Defendant's

request for oral argument on its motion for summary judgment is **DENIED**.

## I.    BACKGROUND

Plaintiff was employed by defendant from February 17, 2003, until June 23, 2004, as a

Clinical Hospital Specialist ("CHS").  *Amended Complaint* ("*Am. Comp.*") ¶ 6.[1]  CHS's are

responsible for promoting and selling a product and for educating doctors and other opinion

leaders with regard to that product.  *Plaintiff's First Deposition*[2] ("*Pl. Dep. I*") at 97-98.  When

plaintiff first began working for defendant she was responsible for only one product, the Gliadel

Wafer, which is an implantable wafer form of chemotherapy.  *Pl. Dep. I* at 97-98;  *Am. Comp.* ¶

7.  The Gliadel Wafer is primarily used by neurosurgeons, oncologists and neurooncologists.  *Pl.

Dep. I* at 104.

During the period that plaintiff sold the Gliadel Wafer, Michael Least was her Area

Business Director.  *Am. Comp.* ¶ 12.  Plaintiff was successful at meeting defendant's goals

related to the Gliadel Wafer and, during that time period, plaintiff was awarded the "GLIADEL

Central Area Impact Player of the Month for June, 2003" for her sales of the Gliadel Wafer.

*Exhibit 1* attached to *Plaintiff's Answer to Motion for Summary Judgment* ("*Plaintiff's

Memorandum Contra*"),[3] Doc. No. 56.  Plaintiff also received 1000 Sales Driver Points in the 4th

quarter of 2003 in a contest instituted by defendant's Director of Sales and Marketing, Kerry

Clem, for the purpose of increasing Gliadel sales and market share.  *Pl. Ex. 1*;  *Am. Comp.* ¶ 12.

---

[1]Many of plaintiff's assertions and allegations are taken from the *Amended Complaint,* which is not verified, and from plaintiff's memoranda in opposition to the motion for summary judgment, which are unsworn.

[2]Relevant portions of plaintiff's first deposition are attached as *Exhibit 1* to *Defendant's Motion for Summary Judgment*.

[3]All exhibits attached to *Plaintiff's Memorandum Contra*, except deposition transcripts, will be designated "*Pl. Ex.*"

In addition, plaintiff received a favorable performance review for her 2003 activities and received a salary increase and stock option award. *Pl. Ex. 1*; *Exhibit 2* and *Exhibit 4* attached to *Defendant's Motion for Summary Judgment* [4]; *Am. Comp.* ¶ 18. Plaintiff alleges, too, that Mr. Least verbally informed her that her performance was exceptional and that her performance review would have been even more complimentary had she been with the company longer. *Am. Comp.* ¶ 12.

In October 2003, defendant acquired rights to the drug Aggrastat from Merck & Co., Inc. ("Merck") for a price of more than $80 million. *Plaintiff's Second Deposition* [5] ("*Pl. Dep. II*") at 12; *Deposition of John Buergenthal* [6] ("*Buergenthal Dep.*") at 55. Aggrastat is used primarily by cardiologists in the treatment of acute coronary syndrome. *Am. Comp.* ¶ 7.

In December 2003, defendant hired Carl Carlson and, in January 2004, Mr. Carlson assumed the position as the new Area Business Director to manage the territory in which plaintiff worked. *Am. Comp.* ¶ 11; *Deposition of Carl Carlson* [7] ("*Carlson Dep.*") at 117. Also, defendant introduced Aggrastat to its marketed product line in January 2004 and, at that time, the drug was added to the responsibilities of all CHSs, including plaintiff. *Pl. Dep. I* at 108. Consequently, from January 2004 through June 2004, when her employment with defendant

---

[4]All exhibits attached to *Defendant's Motion for Summary Judgment*, except deposition transcripts, will be designated "*Def. Ex.*"

[5]Relevant portions of plaintiff's second deposition are attached as *Exhibit 5* to *Defendant's Motion for Summary Judgment*.

[6]John Buergenthal is defendant's Director of Human Resources. *Am. Comp.* ¶ 15. Relevant portions of Mr. Buergenthal's deposition are attached as *Exhibit 4* to *Defendant's Motion for Summary Judgment*.

[7]Relevant portions of Mr. Carlson's deposition are attached as *Exhibit 6* to *Defendant's Motion for Summary Judgment*.

3

ended, plaintiff took on the role of CHS for Aggrastat, as well as for the Gliadel Wafer.

Anticipating increased time and demands that responsibility for Aggrastat would place on the

existing CHSs, defendant expanded its employee base and reduced the geographical territory of

each of its CHSs.  *Pl. Dep. I* at 105-06, 108; *Pl. Dep. II* at 22.

Plaintiff's territory contained the largest prescriber of Aggrastat in the United States,

Riverside Methodist Hospital ("Riverside"), a part of the Ohio Health System ("Ohio Health").

*Pl. Dep. II* at 54.   Director of Clinical Technology Assessment for Ohio Health, Kathy Morman,

testified that Riverside utilizes 95% of all Aggrastat purchased by Ohio Health.  *Affidavit of*

*Kathy Morman* ("*Morman Aff.*") ¶ 5.[8]  Ms. Morman explains that Ohio Health received a special

pricing arrangement from Merck based on the maintenance of a high market share of Aggrastat

utilization within Ohio Health, and that, following Aggrastat's purchase by defendant, defendant

and Ohio Health reached an agreement to continue that same price and volume arrangement.  *Id.*

¶¶ 3,  4.  Ms. Morman testified that, in order for the system-wide pricing arrangement to be of

benefit to Ohio Health, Aggrastat needed to be aggressively promoted in both Riverside and the

other "feeder hospitals" in Ohio Health.  *Id.* ¶ 5.

On January 2, 2004, plaintiff alleges that she informed Mr. Clem that she was pregnant.

*Am. Comp.* ¶ 10.

From January 4 through 15, 2004, after the addition of Aggrastat to its product line,

defendant held its National Sales Meeting in Florida.  *Buergenthal Dep.* at 88-89.  The meeting

was designed, among other things, to allow the CHSs to become familiar with Aggrastat and the

---

[8]Ms. Morman's affidavit is attached as *Exhibit 8* to *Defendant's Motion for Summary*
*Judgment*.

aggressive sales strategy defendant planned to utilize for the drug.  *Pl. Dep. II* at 10-12; *Carlson Dep.* at 146.  All CHSs were asked to attend the sales meeting; however, plaintiff alleges that she informed Mr. Clem that she was unable to attend because of her pregnancy.  *Pl. Dep. II* at 8-9.  Mr. Clem allegedly responded that, while he wished plaintiff could attend, "the most important thing is for [her] to take care of [her]self."  *Id.*

On January 15, 2004, apparently because plaintiff did not attend the National Sales Meeting, Mr. Carlson emailed her to express defendant's commitment to her success and its willingness to continue to work with her to ensure that she received proper Aggrastat training.  *Def. Ex. 10.*  The email also indicated that plaintiff should contact defendant's Human Resources Department

> to discuss the appropriate method of filing the days taken off work.  We want to make sure to utilize the available HR programs to your benefit.  Please follow-up w/me after your discussions to inform me of the progress and decisions made.

*Id.*

On February 3, 2004, a territory management meeting was held in Columbus, Ohio, where Mr. Carlson conveyed his concern to plaintiff that she had not completed Aggrastat training.  *Carlson Dep.* at 54.  *Pl. Ex. 4.*  Plaintiff contends that "after several emails to both [Mr. Carlson] and the new Director of Training, Casaundra Copeland, [she] received the training objectives from Mr. Carlson via email on February 5, 2004."  Mr. Carlson's email stated, in pertinent part:

Expectations:

1.  Inform me on a daily basis re[garding] reception of the [training] CD so I can make sure you get it.

2.  Complete your business plan per my email guidelines and examples sent by

5

2/11 COB

3. Contact Casaundra [Copeland] on a daily basis to discuss training progress and issues requiring clarification.

4. Contact [two co-employees] ASAP to schedule a day to work together to discuss Aggrastat, Gliadel and territory info[rmation] that can be exchanged to the benefit of all.

*Pl. Ex. 3*. Plaintiff does not indicate whether she complied with Mr. Carlson's expectations.

On February 15, 2004, plaintiff received a five page memorandum from Mr. Carlson which indicated that the management meeting held on February 3, 2004, was vital to "discuss [plaintiff's] progress and [defendant]'s expectations." *Pl. Ex. 4*. In the memorandum, Mr. Carlson expressed his concerns about plaintiff's performance, which he set out in the memorandum. *Id.* Mr. Carlson indicated that the deficiencies noted in the memorandum were "clear impediments to [her] success." *Id.* He added:

Please understand that this is a serious situation requiring your immediate attention. If you fail to meet the objectives noted above, further disciplinary action will result, which may include a more formal performance plan and/or termination of your employment.

*Id.*

In the *Amended Complaint*, plaintiff alleges that the deficiencies addressed in Mr. Carlson's February 15, 2004, memorandum "were all false and/or exaggerated." *Am. Comp.* ¶13. In *Plaintiff's Memorandum Contra*, plaintiff contends that defendant "would have the court to believe that a brand new manager, Mr. Carlson, in less than 10 business days, had cause for concern about a sales representative that had nothing but excellent reviews and was a top performer's ability [*sic*] to aggressively sale [*sic*] Aggrastat." *Plaintiff's Memorandum Contra* at 3. Instead, plaintiff contends, she was given this poor evaluation because she was pregnant. *Id.*

6

Plaintiff also sent an email to Mr. Carlson refuting all of the alleged deficiencies.  *Am. Comp.* ¶ 14;  *Pl. Ex. 16.*

On February 18, 2004, plaintiff reported to Mr. Buergenthal that she believed that she was being discriminated against based on her pregnancy.  *Am. Comp.* ¶ 15.  Plaintiff expressly alleges that she made a formal complaint that Mr. Carlson was intentionally making false statements about her performance.  *Id.*  However, Mr. Buergenthal responded that plaintiff was paranoid, that Mr. Carlson's memorandum was simply a statement of expectations and that plaintiff should "just live with it."  *Id.*

Plaintiff alleges that she was never contacted by anyone in defendant's company in regard to her formal complaint of pregnancy discrimination, nor was she provided with complaint forms.  *Id.* ¶ 18.

On February 26, 2004, Mr. Carlson accompanied plaintiff on a sales call to Riverside.  *Pl. Dep. II* at 54; *Carlson Dep.* at 195-96.  Mr. Carlson testified on deposition:

Q. Was [plaintiff] meeting with customers and promoting [Aggrastat]?

A.  I'd have to say no.

Q.  Okay.  Was that reflected in her sales dollars or --

A.  It was reflected in her activity.

Q.  Okay.  Now, how do you know she wasn't meeting them?

A.  Because, some of these documents – when I'm with her she doesn't know the customers.  We go places that she has never been to before.

Q.  Okay.  Give me an example of a place that you went to where she had never been before.

A. . . . we walked in [Riverside] and she knew no one.  She didn't know the cath

7

> lab[9] supervisors. She did not know the policies adhered to, whether we had to
> check in etcetera. The last time we went to Riverside emergency department, she
> had to ask who the emergency department supervisor was to speak to him because
> she just didn't know who it was.

*Carlson Dep.* at 83-84. In addition, Mr. Carlson observed that plaintiff did not know the location

of the various departments at Riverside and that she was taking "copious notes regarding

personnel that she had never met." *Id.* at 196.

On that same day, February 26, 2004, plaintiff alleges, she met with Mr. Carlson and Mr.

Clem and informed them that she believed she was being harassed and discriminated against on

the basis of her pregnancy. *Am. Comp.* ¶ 19. Mr. Clem allegedly responded, "I don't care about

you being pregnant, I just care about your sales." *Id.*

On March 18, 2004, Mr. Carlson sent a memorandum to plaintiff regarding her

performance. *Def. Ex. 13*. The memorandum began by complimenting plaintiff's attempts at

improvement; Mr. Carlson then indicated that he hoped the trend would continue by ensuring

that plaintiff understood the "continuing requirements and expectations" of her position. *Id.* Mr.

Carlson then set out ten deadlines to which plaintiff was to adhere. *Id.* In closing, Mr. Carlson

stated:

> Kristyn, please understand that while you have shown improvement, you must
> continue this trend by showing even more improvement. As my method of
> determining your improvement will be a review of your activities with regard to
> the requirements outlined in this memo and the memo of February 10, you must
> continue to meet the expectations outlined above.
>
> Additionally, please keep in mind that failure to meet these expectations and
> deadlines noted above or to meet additional deadlines presented separately, will

---

[9] Throughout the parties' memoranda they refer to a "Cath Lab," which is apparently short
for Catheterization Laboratory.

8

lead to further disciplinary action, which may include the immediate termination
of your employment.

*Id.*

Plaintiff alleges that the March 18, 2004, memorandum was a revised memorandum and
that the original had been sent to her on March 12, 2004.  *Am. Comp.* ¶ 20.  Plaintiff alleges that,
after she had received the first memorandum, she participated in a conference call with Mr. Clem
and Mr. Carlson to address the alleged deficiencies in plaintiff's performance, which plaintiff
contends "contained false statements" about her performance.  *Id.* ¶¶ 20, 21.  Plaintiff does not
indicate whether she met any of the deadlines set forth in the memoradum.

Ms. Morman testified that, in February and March 2004, sales representatives from
Millennium Pharmaceuticals, Inc., made a significant effort "to influence doctors to switch from
Aggrastat to Integrilin, a competing product."  *Morman Aff.* ¶ 6.  As a result, Riverside "began to
see a dip in the utilization of Aggrastat and an increase in the utilization of Integrilin, which
continued through April and May."  *Id.*

On April 19, 2004, Vice President of Commercial Operations, Mike Kelly, accompanied
plaintiff during her day.  *Def. Ex. 14*.  On April 22, 2004, Mr. Kelly sent a memorandum to
plaintiff to expand on his discussion with her about several areas in which he felt that
improvement was required.  *Id.*  Mr. Kelly addressed two main concerns in the memorandum.
First, he noted plaintiff's inefficient use of time:

> You need to make an effort to get in front of more customers (both Gliadel and
> Aggrastat).  I arrived at 10:30 and I had to leave at 3:00 to attend a meeting at
> Riverside with Kathy Morman.  During our time together (4.5 hours) we had one
> appointment (lunch at noon with Dr. Yakubov) and met with a satellite
> pharmacist at Grant.
> . . . .

9

You also need to see more decision makers throughout the course of a day.

*Id.* Second, Mr. Kelly expressed concern about plaintiff's ability to "detail," *i.e.*, to identify

opportunities to differentiate defendant's products and to effectively deliver key messages with

supporting clinical evidence. *Id.*

On April 20, 2004, plaintiff alleges that she was scheduled to meet with representatives

of Ohio Health. *Am. Comp.* ¶ 24. Plaintiff contends, however, that when she arrived for the

meeting she was told by Mr. Carlson that she could not attend the meeting and that she was to go

to the hotel and wait in the hotel for a "debrief" following the meeting. *Id.*

Defendant contends that, in May 2004, defendant's Medical Science Liaison, Linda Hale,

accompanied plaintiff to a lunch meeting at Riverside. *Deposition of Linda Hale*[10] ("*Hale Dep.*")

at 9. At the Riverside lunch meeting, Ms. Hale testified, it "was obvious" that plaintiff had not

spent much time at the Cath Lab based on her lack of familiarity with the Lab personnel. *Id.* at

13. Ms. Hale expected plaintiff to spend, on average, one day a week at the Riverside Cath Lab

until she knew "everybody in the lab." *Id.* Also, Ms. Hale testified that she had asked plaintiff

to schedule several appointments for that day so that her time with plaintiff and in Columbus

would be spent efficiently. *Id.* at 19. Plaintiff advised Ms. Hale that she was unable to make any

other appointments that day. *Id.* at 18.

Plaintiff, however, contends that her lunch with Ms. Hale was on March 18, 2004.

*Plaintiff's Memorandum Contra* at 4. Plaintiff asserts that, when the meeting with Ms. Hale was

scheduled, Ms. Hale did not ask to attend multiple appointments with her and that, instead, Ms.

---

[10]Relevant portions of Ms. Hale's affidavit are attached as *Exhibit 15* to *Defendant's Motion for Summary Judgment*.

Hale had scheduled her departing flight to leave immediately following the lunch appointment. *Id.* Further, plaintiff contends that she "knew many of the physicians and cath lab personnel and had only completed Aggrastat training test less that [*sic*] 20 business days prior to this lunch." *Id.*

In June 2004, Ms. Copeland scheduled a two-day training/observation session with plaintiff for June 17 and 18, 2004. On June 16, 2004, Ms. Copeland emailed plaintiff, stating, among other things:

> My goal in working with you is to complete the [Aggrastat] training that we started in January. I will be observing you with clinicians and your techniques in presentation as well as objection handling. I am also hopeful that I will be able to see you do an inservice as well during our time together. This will complete part one of the final check offs for Aggrastat.
>
> I look forward to working with you on two action packed days.

*Pl. Ex. 13*. Plaintiff responded to Ms. Copeland that same day, indicating that "[e]verthing that I had scheduled [for their meeting] has fallen apart today." *Pl. Ex. 12*. Further, plaintiff asked Ms. Copeland to let her know what she needed to complete in order to be certified in Aggrastat, since plaintiff believed that her training had been completed in February. *Id.* Ms. Copeland replied by email informing plaintiff that they could "work anywhere in your area and accomplish your goals [and] to complete training too. That's easy." *Id.*

On June 17, 2004, at 8:05 a.m. plaintiff emailed Ms. Copeland, indicating that she would call her that morning and, again, asked her about obtaining the Aggrastat training goals so that she could focus on them. *Id.* Plaintiff and Ms. Copeland spoke by telephone at 9:15 a.m. After breakfast, the two arrived at Mount Carmel Hospital for plaintiff's first appointment at 11:38 a.m. *Pl. Ex. 11*; *Def. Ex. 16*. However, when plaintiff attempted to gain admittance to the

11

hospital to see three clinicians whom she had allegedly contacted, the security guard informed

her that two of them were on vacation. *Def. Ex. 16.* The security guard called the third contact,

the Cath Lab manager, who advised that he was too busy to see them and that plaintiff needed to

make an appointment. *Id.* Plaintiff and Ms. Copeland were asked to leave the hospital. *Id.* The

Mount Carmel Hospital call took approximately 20 minutes. *Id.*

The second call on June 17, 2004, was made to the Ohio State Medical Center. *Id.* Ms.

Copeland and plaintiff met with a "neuro nurse practitioner" and plaintiff gave a presentation

that was, in Ms. Copeland's estimation, "politely tolerated." *Id.* According to Ms. Copeland, it

"was clear that this clinician did not need the inservice we provided. It was the wrong

presentation and approach for th[e] situation." *Id.* Plaintiff ended her day with Ms. Copeland at

2:45. *Id.*

Plaintiff alleges that, upon first meeting Ms. Copeland on June 17, 2004, the latter

commented that plaintiff had "gotten really big" and asked plaintiff questions about when and

how long she would be on pregnancy leave. *Am. Comp.* ¶ 30. Ms. Copeland also allegedly

stated that plaintiff's territory generated a lot of money and that the company really needed the

money from her territory. *Id.* Also, plaintiff alleges, Ms. Copeland told plaintiff that it was

obvious that plaintiff "really knew her stuff" and enjoyed a good relationship with the health

care professionals with whom they met. Ms. Copeland promised that she would put these

comments in writing. *Id.* ¶ 31. Ms. Copeland also allegedly stated to plaintiff that the purpose

of her visit was "not to put the nail in the coffin." *Id.*

Ms. Copeland also testified that plaintiff had only one appointment set up for the second

12

day of Ms. Copeland's visit, but that it had fallen through.  *Deposition of Casaundra Copeland*[11] ("*Copeland Dep.*") at 42.  Plaintiff asked if Ms. Copeland wanted to "knock on a few doors" (referring to calling on clinicians without an appointment).  *Pl. Ex. 12*.  Ms. Copeland did not meet with plaintiff that day.  *Id.*  Ms. Copeland summarized the two days in a narrative drafted on June 21, 2004:  "We saw one nurse clinician in two days."  This narrative also set out directives for plaintiff:

1.    Set up two full days (8 am to 5 pm) for the work with visit with Kathleen Long.

2.    Get in front of as many clients as possible.

3.    Make sure to balance days with both Aggrastat and Gliadel.

4.    Stay locally so that you can accomplish the maximum number of calls with limited windshield time.  Work both neuro and cardiac/ER areas in each facility.

*Def Ex. 16*; *Pl. Ex. 11.*

On June 22, 2004, plaintiff received a Field Contact and Development evaluation which, she contends, measured the same employment attributes as her January 15, 2004, evaluation. *Am. Comp.* ¶ 33.  Plaintiff alleges that she received significantly lower scores than those she received on the February review.  *Id.* ¶ 34.  Neither party has provided this document to the Court.

On June 23, 2004, at the request of Mr. Carlson, plaintiff met with him and Mr. Clem at the Columbus, Ohio, airport where plaintiff was informed that she had been terminated from defendant's employ.  *Id.* ¶ 37.  The decision to terminate plaintiff's employment was made by

---

[11]Relevant portions of Ms. Copeland's deposition are attached as *Exhibit 9* to *Defendant's Motion for Summary Judgment*.

Mr. Carlson, Mr. Clem and Mr. Buergenthal.  *Buergenthal Dep.* at 11.  Mr. Kelly concurred in

the decision.  *Id.*  Plaintiff's termination letter indicated the following three reasons for her

termination:

> 1.   Unacceptable sales proficiency with regard to Aggrastat, as witnessed last
>      week [June 17, 2004] by the Director of Sales Training [Ms. Copeland];
>
> 2.   Lack of confidence and evidence to support the belief that you have made
>      regular, repeated and planned sales calls to doctors and other "opinion
>      leaders" in your territory;
>
> 3.   Unacceptable degree of management attention and focus that is required
>      by your performance.

*Def. Ex. 17.*  Plaintiff contends that all three reasons for her termination "are false."  *Am. Comp.*

¶ 37.

On June 29, 2004, plaintiff returned her company car to a leasing company.  *Id.* 38.  The

car repossession receipt indicated that plaintiff was a former employee of defendant and that she

was pregnant.  *Id.* ¶ 38.  It is not clear who wrote the comment on the receipt.  *Pl. Dep. II,* at

187-88.

Plaintiff filed this action in state court on November 3, 2004, and it was removed to this

Court on December 16, 2004.  Doc. No. 1.  On December 17, 2004, plaintiff filed the *Amended*

*Complaint.*  Doc. No. 3.  At that time, plaintiff was represented by counsel.  However, on

November 9, 2005, plaintiff's attorney filed a motion to withdraw from this action, Doc. No. 34,

to which plaintiff consented, Doc. No. 37, and the Court granted her counsel's motion on

November 22, 2005, Doc. No. 38.  Since that time, plaintiff has proceeded without the assistance

of counsel.

On December 23, 2005, defendant filed *Defendant's Motion to Dismiss* pursuant to Fed.

14

R. Civ. P. 41(b) for failure to prosecute.  Doc. No. 40.  Plaintiff opposed that motion on January 6, 2006.  Doc. No. 41.  Defendant did not file a reply in support of this motion.

On February 14, 2006, defendant filed *Defendant's Motion to Compel and for Sanctions* pursuant to Fed. R. Civ. P. 37(a) for failure to cooperate in discovery.  Doc. No. 48.  That motion has been fully briefed.

On March 31, 2006, defendant filed *Defendant's Motion for Summary Judgment*.  Doc. No. 55.  That motion has been fully briefed.

## II.      STANDARDS OF REVIEW

### A.      *Pro Se* Litigants

In the case *sub judice*, plaintiff is proceeding without the assistance of counsel.  A *pro se* litigant's pleadings must be construed liberally and are held to a less stringent standard than are formal pleadings drafted by lawyers.  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Williams v. Browman*, 981 F.2d 901, 903 (6th Cir. 1992).  A court must make a reasonable attempt to read the pleadings of a *pro se* litigant to state a valid claim on which the plaintiff could prevail, despite any failure to cite proper legal authority, any confusion of various legal theories, any poor syntax and sentence construction, or any unfamiliarity with pleading requirements.  *Ashiegbu v. Purviance*, 74 F. Supp.2d 740, 749 (S.D. Ohio 1998) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).  "This standard does not mean, however, that *pro se* plaintiffs are entitled to take every case to trial."  *Id.* (citing *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996)).  "Indeed, courts should not assume the role of advocate for the *pro se* litigant."  *Id.* (citing *Hall*, 935 F.2d at 1110)  Although many of plaintiff's allegations in response to the motion for summary judgment are not presented in

15

evidentiary form, the Court has nevertheless considered those allegations.

### B.    Summary Judgment

The standard for summary judgment is well established.  This standard is found in Fed.

R. Civ. P. 56, which  provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Pursuant to Rule 56(c), summary judgment is appropriate if "there is no

genuine issue as to any material fact . . . ."  In making this determination, the evidence must be

viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398

U.S. 144 (1970).  "A court may grant summary judgment when 'the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party.'"  *Agristor Fin. Corp. v*

*Van Sickle*, 967 F2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986))

The party moving for summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the

record which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party who "must set

forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  "Once the moving party has

proved that no material facts exist, the non-moving party must do more than raise metaphysical

or conjectural doubt about issues requiring resolution at trial."  *Agristor Fin. Corp.*, 967 F.2d at

236) (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 586 (1986)).

16

III.    ANALYSIS

Defendant moves this Court for summary judgment on all plaintiff's claims, for dismissal of all plaintiff's claims for failure to prosecute and for an order compelling plaintiff to respond to its discovery requests and for sanctions in the form of defendant's costs in preparing and filing its motion to compel and for sanctions.  Because the Court concludes that defendant's motion for summary judgement is meritorious, the Court need not consider the remaining motions.

Plaintiff claims that she was terminated by defendant because she was pregnant and in retaliation for her complaints about pregnancy discrimination in violation of Title VII and Ohio's civil rights laws.  Because federal case law governing Title VII actions is generally applicable to discrimination and retaliation claims under Ohio law, this Court will analyze plaintiff's discrimination and retaliation claims by reference to federal law.  *Singfield v. Akron Metropolitan Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (citing *Little Forest Med. Ctr. v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10 (Ohio 1991) and *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196 (Ohio 1981)).

Section 705(a) of Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from retaliating against an employee because she had engaged in a protected activity.  Title VII also provides that, "it shall be an unlawful employment practice for an employer  . . . to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ."  42 U.S.C. § 2000e-2(a)(1).  In 1978, Congress enacted the Pregnancy Discrimination Act ("PDA"), which amended Title VII to specify that sex discrimination under Title VII includes discrimination on the basis of pregnancy.  42 U.S.C. § 2000e(k); *Shaw v. Delta Air Lines, Inc.*,

17

463 U.S. 85, 89 (1983); *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996). "Therefore, it is now well settled that a claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *Boyd*, 88 F.3d at 413; *see also Gover v. Speedway Super Am.*, 254 F. Supp. 2d 695, 703-04 (S.D. Ohio 2002) (applying Title VII discrimination frameworks to pregnancy discrimination case).

A plaintiff may establish a case of discrimination or retaliation either by presenting direct evidence of intentional discrimination or retaliation by the defendant, or by showing the existence of facts which create an inference of discrimination or retaliation. *Talley v. Bravo Pitino Rest., LTD.*, 61 F.3d 1241, 1248 (6th Cir. 1995) (discrimination); *Abbot v. Crown Motor Co.*, 348 F.3d 537, 542 (6th 2003) (retaliation). Direct evidence is that evidence which, if believed, requires the conclusion that an unlawful consideration was a motivating factor in the employer's action. *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 114-5 (6th Cir. 1987). "Direct evidence proves the existence of a fact without any inferences or presumptions." *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999). Once there is credible direct evidence, the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment even had it not been motivated by discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-5 (1989) (plurality); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994).

In the case *sub judice*, plaintiff offers no direct evidence that plaintiff's employment was terminated because she *complained* about pregnancy discrimination. With regard to her claim of actual pregnancy discrimination, plaintiff asserts that Casaundra Copeland remarked that

18

plaintiff had "gotten really big." *Am. Comp.* ¶ 30.[12]  This statement simply does not amount to

direct evidence of pregnancy discrimination.  The United States Supreme Court "has held that

'simple teasing' or 'offhand comments, and isolated incidents' do not amount to direct evidence

of discrimination under Title VII."  *Singfield*, 389 F.3d at 561 (citing *Fara v. City of Boca Raton*,

524 U.S. 775, 788 (1988) and *accord Hafford v. Seidner*, 183 F.3d 506, 512-15 (6th Cir. 1999)).

Moreover, Ms. Copeland's statement is of little import in this action because Ms.

Copeland was not involved in the decision to terminate plaintiff.  *See Bush v. Dictaphone Corp.*,

161 F.3d 363, 369 (6th Cir. 1998) (quoting *Hopkins*, 490 U.S. at 277 (O'Connor, J.,

concurrence) ("'[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated

to the decisional process itself [can not] suffice to satisfy plaintiff's burden . . .' of demonstrating

animus.").  For all these reasons, the Court does not deem this case to present direct evidence of

discrimination or retaliation.

In cases such as this, *i.e.,* "that lack direct evidence of intent to discriminate, the

well-established *McDonnell Douglas/Burdine* burden-shifting framework applies to claims of

discrimination brought under Title VII . . . and Ohio law."  *McClain v. Northwest Cmty. Corr.*

*Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006) (citing *Mitchell v. Toledo Hosp.*, 964

F.2d 577, 582 (6th Cir. 1992), *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)

and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).   Likewise, the *McDonnell*

*Douglas/Burdine* burden-shifting framework also applies to retaliation claims brought under

Title VII and Ohio law that lack direct evidence.  *Abbot v. Crown Motor Co.*, 348 F.3d 537, 542

(6th 2003) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002) and *Laderach v. U-Haul of*

---

[12]Plaintiff's assertion in this regard is not presented in the form of evidence.

*Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000)).  Under the *McDonnell Douglas/Burdine*
paradigm, a plaintiff claiming unlawful discrimination or retaliation under Title VII must first
establish a *prima facie* case.  *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 256.
*See also Boyd*, 88 F.3d at 413 (pregnancy discrimination); *Johnson v. United State Dep't of
Health and Human Servs.*, 30 F.3d 45, 47 (6th Cir. 1994) (retaliation).

To establish a *prima facie* case of pregnancy discrimination, a plaintiff must show: (1)
that she was pregnant; (2) that she was qualified for her job; (3) that she was subjected to an
adverse employment decision; and (4) that there is a nexus between her pregnancy and the
adverse employment decision.  If a plaintiff establishes a *prima facie* case of disparate treatment,
the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory
reason for its actions.  *Boyd*, 88 F.3d at 413 (pregnancy discrimination) and *Johnson*, 30 F.3d at
47 (retaliation) (both citing *Burdine*, 450 U.S. at 252-53).

To establish a *prima facie* case of retaliation, a plaintiff must present evidence of the
following:  (1) that she engaged in some protected activity; (2) that this exercise of protected
rights was known to defendant; (3) that the defendant thereafter took adverse employment
action; and (4) that there was a causal connection between the protected activity and the adverse
employment action.  *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir. 1984);
*Buck v. Fries and Fries, Inc.*, 953 F. Supp. 896, 907 (S.D. Ohio 1996).  Once plaintiff establishes
a *prima facie* case of retaliation, the burden of going forward then shifts to defendant to
articulate a legitimate, nonretaliatory reason for its action.  *Board of Trustees v. Sweeney*, 439
U.S. 24 (1978); *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).

In the case of discrimination or retaliation, if the defendant satisfies its burden of

20

producing a legitimate nondiscriminatory or nonretaliatory reason for terminating the plaintiff's employment, the *McDonnell Douglas/Burdine* presumption of intentional discrimination or retaliation "drops out of the picture." *Boyd*, 88 F.3d at 413 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 (1993)). The employee-plaintiff must then prove by a preponderance of the evidence that the defendant intentionally discriminated or retaliated against her. *Id.* Again, the ultimate burden of persuasion remains throughout this burden-shifting analysis on the plaintiff. *Burdine*, 450 U.S. at 253; *Wrenn v. Gould*, 808 F.2d at 501.

For the purpose of resolving its motion for summary judgment, defendant concedes that plaintiff has established a *prima facie* case of pregnancy discrimination and of retaliation. Thus, the issues before the Court are whether defendant has met its burden of articulating a legitimate nondiscriminatory and nonretaliatory reason for plaintiff's termination and, if so, whether plaintiff has met her burden of rebutting defendant's explanation by establishing that it is pretextual.[13]

### A.     Defendant's Proffered Reasons for Terminating Plaintiff.

Because defendant concedes that plaintiff has established a *prima facie* case of both pregnancy discrimination and retaliation, the burden shifts to defendant to articulate a legitimate nondiscriminatory and nonretaliatory reason for terminating plaintiff. *See Burdine*, 450 U.S. at 252-53; *Wrenn*, 808 F.2d at 500.

_____

[13]Much of the evidence provided by plaintiff and many of the arguments she has made in opposition to *Defendant's Motion for Summary Judgment* are simply irrelevant to the issues before the Court, although they may be relevant to establish her *prima facie* case of discrimination and/or retaliation. Recognizing plaintiff's *pro se* status, however, the Court has made a "reasonable attempt" to read *Plaintiff's Memoranda Contra* to state a valid opposition, "despite the plaintiff's failure to cite proper legal authority [or] her confusion of various legal theories[.]" *See Ashiegbu v. Purviance*, 74 F. Supp.2d at 749.

Defendant has articulated three reasons for plaintiff's termination:

Unacceptable sales proficiency with regard to Aggrastat, as witnessed last week by the Director of Sales Training;

Lack of confidence and evidence to support the belief that [plaintiff has] made regular, repeated and planned sales calls to doctors and other "opinion leaders" in [plaintiff's] your territory;

Unacceptable degree of management attention and focus that is required by [plaintiff's] performance.

*Def. Ex. 17.*

The Court concludes that these three reasons are sufficient to meet defendant's burden of articulating a legitimate nondiscriminatory and nonretaliatory reason for terminating plaintiff. A defendant is not required "to prove its legitimate, nondiscriminatory [or nonretaliatory] reason, but merely to produce it." *Burton v. Ohio*, 798 F.2d 164, 167 (6th Cir. 1986); *see also Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24, 24 fn.2 (1978) ("employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons") (internal quotation marks omitted).

**B.     Plaintiff's Rebuttal of Defendant's Proffered Reasons for her Termination**.

Because defendant has met its burden of articulating a legitimate nondiscriminatory and nonretaliatory reason for terminating plaintiff, the burden now shifts to plaintiff to demonstrate that these proffered reasons were not the true reasons for her termination, which were actually intentional discrimination or retaliation. *See Burdine*, 450 U.S. at 255. That is, plaintiff must now rebut defendant's justification for plaintiff's termination by showing that it is really a pretext for unlawful discrimination and/or retaliation. *See Manzer*, 29 F.3d at 1082. To raise a genuine issue of material fact on the validity of defendant's explanations for plaintiff's

22

termination, plaintiff must show by a preponderance of the evidence:

> (1) that the proffered reasons had no basis in fact;

> (2) that the proffered reasons did not actually motivate the adverse employment action; or

> (3) that the proffered reasons were insufficient to motivate the adverse employment action.

*Id.* at 1084. Plaintiff contends that the three articulated reasons for the termination of her employment "are false," *Am. Comp.* 37, and therefore had no basis in fact. Plaintiff does not appear to contend that, although the proferred reasons could justify her termination, those reasons did not actually motivate the defendant's decision, *see Manzer,* 29 F.3d at 1084. Neither does plaintiff appear to contend that the proffered reasons were insufficient because they were not applied to a similarly situated fellow employee. *See Manzer,* 29 F.3d at 1084.[14]

It appears, then, that plaintiff attempts only a showing of the first category of pretext, *i.e.*, that defendant's proffered reasons for her termination are false. In this case, the defendant

---

[14]Plaintiff does refer to the bottom line sales of her replacement, Lisa Merullo. *Plaintiff's Answer to Reply*, at 2. However, any comparison of plaintiff and Ms. Merullo cannot satisfy the third type of showing of pretext unless they are "similarly situated." To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell*, 964 F.2d at 583). *See also Clayton v. Meijer, Inc.*, 281 F.3d 605 (6th Cir. 2002) (holding that conduct of other employees must be similar in relevant aspects).

In the instant action, plaintiff does not attempt to compare her and Ms. Merullo's ability to promote the utilization of or the education about Aggrastat, the regularity of their sales calls or the amount of management involvement their performances required, *i.e.*, the reasons for plaintiff's termination. Consequently, even if plaintiff intended to establish the third type of pretext showing, she has not compared herself to a similarly situated individual and, thus, that showing must necessarily fail.

employer has articulated three grounds for terminating plaintiff's employment, all of which plaintiff claims are false. The Court will address each.

      1.    <u>Plaintiff has failed to raise a genuine issue related to defendant's conclusion that she possessed unacceptable sales proficiency with regard to Aggrastat.</u>

Defendant asserts that plaintiff's employment was terminated, first, because plaintiff did not possess acceptable "sales proficiency with regard to Aggrastat, as witnessed last week by the Director of Sales Training." *Def. Ex. 17.* In *Plaintiff's Memorandum Contra*, plaintiff argues that this reason is false. *Plaintiff's Memorandum Contra* at 6. In support of this argument, plaintiff offers her own opinions of her performance and asserts that the Director of Sales Training, Casaundra Copeland, told her that "she clearly knew her stuff" with regard to Gliadel and that overall she "did a good job." *Id.* Plaintiff's reliance on any such statements is misplaced because they relate to plaintiff's performance promoting the Gliadel Wafer–not Aggrastat, the articulated basis for her termination. Moreover, plaintiff's subjective perception of her own performance is legally irrelevant. *See Mitchell*, 964 F.2d at 585; *Wrenn v. Gould*, 808 F.2d at 502 (a plaintiff's perception of his competence is irrelevant–it is the employer's perception and motivation that is key).

Moreover, and importantly, the Director of Clinical Technology Assessment for Ohio Health, Kathy Morman, testified that, during February, March, April and May 2004, Aggrastat utilization decreased at Riverside–the largest user of Aggrastat in the United States–and that a competitor began to realize success at Riverside. *Morman Aff.* ¶ 6. Plaintiff was the individual responsible for promoting Aggrastat within Riverside during this period. *Id.* ¶ 7. Thus, the record supports Ms. Copeland's observation and defendant's conclusion based on Ms. Copeland's observations, *i.e.*, that plaintiff did not possess acceptable sales proficiency with

regard to Aggrastat.

Thus, even viewing the evidence on this issue in the light most favorable to plaintiff, the Court concludes that plaintiff has failed to raise a genuine issue of material fact with regard to her unacceptable sales proficiency with regard to Aggrastat.

    2.    <u>Plaintiff has failed to raise a genuine issue related to defendant's conclusion that she did not make regular, repeated and planned sales calls to doctors and other opinion leaders in her territory.</u>

Defendant's second stated reason for the termination of plaintiff's employment is its conclusion that plaintiff failed to make "regular, repeated and planned sales calls to doctors and other opinion leaders in [her] territory." *Def. Ex. 17.* The uncontroverted facts in this case support defendant's conclusion:

On February 26, 2004, Area Business Director Carl Carlson accompanied plaintiff to Riverside; he testified that, in his opinion, plaintiff was not meeting with appropriate customers and promoting Aggrastat. *Carlson Dep.* at 195-96. He observed that plaintiff did not know the Cath Lab supervisors, the emergency department supervisor, the hospital policies or even the location of various departments. *Id.* Additionally, plaintiff took copious notes regarding personnel whom she had not met prior to that date. *Id.*

On March 18, 2004, Mr. Carslon drafted a memorandum to plaintiff about his concerns regarding her performance and indicated that she must show improvement by meeting the ten deadlines and expectations set forth in the memorandum. *Def. Ex. 13.* Mr. Carlson warned plaintiff that failure to adequately meet the expectations would lead to further disciplinary action, including "immediate termination." *Id.*

On April 19, 2004, Vice President of Commercial Operations Mike Kelly accompanied

25

plaintiff and observed, as reflected in his memorandum, *Def. Ex. 14*, that plaintiff was not meeting with enough customers (only one doctor and one pharmacist over a four and one-half hour time period) and that plaintiff was unable to effectively deliver key messages with supporting clinical evidence about Aggrastat.

An employee of Ohio Health, Ms. Morman, testified that throughout April and May 2004, Riverside -- plaintiff's key Aggrastat account -- saw a decrease in the use of Aggrastat and an increase in the use of a competing product. *Morman Aff.* ¶ 6.

On June 17, 2004, Ms. Copeland accompanied plaintiff during her day; she noted that plaintiff did not contact her until 8:05 a.m. to begin their day and that they did not arrive at their first appointment until 11:38 a.m. *Def. Ex. 16.* Moreover, when they arrived at their first appointment, they were unable to meet the three individuals with whom plaintiff had intended to meet because plaintiff had not made appointments with them. *Id.* Ms. Copeland was concerned that the expected "action packed days" with plaintiff had ended in the two seeing "only one nurse clinician in two days." *Id.*

In response, plaintiff first argues that, in April 20, 2004, she attempted to attend two meetings at Riverside but that Mr. Carlson prevented her from doing so. *Am. Comp.* ¶ 24. The fact that plaintiff may have been prevented from attending two additional meetings within the entire period that plaintiff was responsible for promoting Aggrastat is simply insufficient to raise a genuine issue that defendant's articulated reason for terminating plaintiff's employment (*i.e.,* that plaintiff failed to make regular, repeated and scheduled appointments) were merely pretext for actual discrimination or retaliation.

Second, plaintiff argues that there is no reason that she should have received poor

performance reviews when she had previously received excellent reviews. *Am. Comp.* ¶ 34. As defendant notes, it is uncontroverted that plaintiff received excellent reviews at a time when she was responsible only for the promotion of the Gliadel Wafer; her poor reviews were made after she became responsible for Aggrastat in addition to the Gliadel Wafer. Thus, plaintiff's earlier excellent reviews are not inconsistent with the later poor reviews. Moreover, the mere fact that plaintiff disagrees with defendant's evaluation of her performance of her does not support a suggestion of pretext. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990) ("the fact that [the plaintiff] disagrees with [the defendant employer]'s assessment of his performance as manufacturing manager does not render [the defendant employer]'s reasons pretextual").

Finally, plaintiff argues that sales of Aggrastat were good, a fact that belies defendant's charge that she failed to make regular calls to customers. Plaintiff also suggests that, because defendant could not have known the actual sales data at the time of her termination, the decision to terminate her employment must have been based on unlawful considerations.

Plaintiff's argument in this regard misses the mark; indeed, it supports defendant's argument that it was not plaintiff's bottom line sales that prompted her termination. *Defendant's Motion for Summary Judgment* at 16; *Reply in Support of Defendant's Motion for Summary Judgment* at 4-5. Instead, it was plaintiff's failure to promote and educate her customers about Aggrastat on a regular, scheduled basis that led to the termination of her employment.

All plaintiff's arguments in support of her claim of pretext fall far short of raising a genuine issue with regard to defendant's conclusion that she failed to make regular, repeated and scheduled calls to the important customers in her territory.

27

3.     Plaintiff has failed to raise a genuine issue as to the truth of defendant's conclusion that her performance required an unacceptable degree of management attention and focus.

Defendant's third stated reason for terminating plaintiff was that her performance required an "[u]nacceptable degree of management attention and focus." *Def. Ex. 17*.  It is uncontroverted that on five occasions, over a period of approximately four and one-half months, plaintiff's superiors accompanied her to observe her performance.  *Pl. Exs. 11, 12, 13*; *Def. Exs. 14, 16*; *Pl. Dep. II* at 54; *Carlson Dep.* at 83-4, 195-96; *Copeland Dep.*  at 42; *Hale Dep.* at 9, 13, 19; *Am. Comp.* ¶ 19.  It is also uncontroverted that eight memoranda or progress reports were drafted by plaintiff's superiors expressing their concerns about her performance.  *Pl. Exs. 3, 4*; *Def. Exs. 10, 13, 14*; *Carlson Dep. 54*; *Am. Comp.* ¶¶ 33, 34.

Plaintiff offers no evidence that this amount of management attention and oversight was acceptable or normal for defendant's employees.  Indeed, plaintiff offers no argument whatsoever related to this final reason for her termination.  Plaintiff cannot rest upon her pleadings but must set forth specific facts showing a genuine issue for trial.  *See Liberty Lobby*, 477 U.S. at 248, 250;  *Evans v. Jay Instrument & Specialty Co.*, 889 F. Supp. 302, 310 (S.D. Ohio 2005).  That is, "in responding to a summary judgment motion, the nonmoving party 'cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact,' but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Gliatta v. Tecum Inc.*, 211 F. Supp. 2.d 992, 1000 (S.D. Ohio 2002) (quoting *Liberty Lobby*, 477 U.S. at 257).  Plaintiff has failed to meet this burden.

4.     Conclusion.

Title VII does not eliminate an employer's traditional prerogatives in making business

decisions so long as the employer's reasons are not discriminatory or retaliatory in violation of law. *United Steelworkers of America v. Weber*, 443 U.S. 193, 207 (1979); *Wrenn v. Gould*, 808 F.2d at 502-03. "It is axiomatic that under Title VII, this Court does not sit as a 'super-personnel' board of review to second guess or re-examine an employer's nondiscriminatory business decisions." *Norris v. Principi*, 254 F. Supp.2d 883, 896 (S.D. Ohio 2003) (citations omitted). As the United States Court of Appeals for the Sixth Circuit has noted, in upholding the discharge of a long-time employee:

> In upholding the discharge against legal challenge, we pass on neither its wisdom nor its humanity. In discharge cases, unless a clear legal violation is shown, it is not appropriate for us to second guess the business judgment of employers in personnel matters.

*Rush v. United Techs., Otis Elevator Div.*, 930 F.2d 453, 458 (6th Cir. 1991).

In the case presently before this Court, plaintiff has not met her burden of offering evidence that defendant's business justifications for terminating her were a pretext for discrimination or retaliation. Plaintiff simply has failed to raise a genuine issue of material fact as to whether defendant's reasons were false, insufficient, or not the real reasons for the adverse action. *See Manzer*, 29 F.3d at 1078. Accordingly, *Defendant's Motion for Summary Judgment* is meritorious.

**WHEREUPON**, in light of the foregoing, *Defendant's Motion for Summary Judgment*, Doc. No. 55, is **GRANTED**, *Defendant's Motion to Dismiss*, Doc. No. 40, and *Defendant's Motion to Compel and for Sanctions*, Doc. No. 48, are **DENIED.**

The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in defendant's favor in this case.

29

 July 7, 2006                                      *s/Norah McCann King*
Date                                              Norah McCann King
                                                  United States Magistrate Judge